UNITED STATES BANKRUPTCY COURT   **FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In Re:

CELESTE C. GRUBIN,        Chapter 7
               Case No. 08-75614

       Debtor.
------------------------------------------------------------------X
GRUBIN, CELESTE, C.

      Plaintiff,

               Adv. Pro. No. 11-9365

  - Against –

SALLIE MAE SERVICING CORP., L.P., NEW YORK
COLLEGE OF OSTEOPATHIC MEDICINE (NYCOM)
OF NYIT, NEW YORK STATE HIGHER EDUCATION
SERVICES (NYHESC), UNITED STATES
GOVERNMENT (USDOJ) and DIRECT LOANS, U.S.
DEPARTMENT OF EDUCATION WILLIAM D. FORD
FEDERAL DIRECT LOAN PROGRAM,

      Defendants.
------------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER

*Appearances:*

Celeste C. Grubin
*Pro Se Plaintiff*
516 Linda Drive
East Meadow, New York 11554


United States Attorney's Office, Eastern District of New York
*Attorney for Defendants U.S. Department of Health and Human Services (incorrectly
denominated as United States Government, DOJ) and Direct Loans, U.S. Department of
Education William D. Ford Federal Direct Loan Program*
By: Vincent Libari, Esq.
610 Federal Plaza, 5th Floor
Central Islip, New York 11722


Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

## INTRODUCTION

Before this Court is an adversary proceeding commenced *pro se* by Dr. Celest C. Grubin, D.O., who is the debtor in this bankruptcy case (hereinafter "Plaintiff"), and against various student loan providers.[1] Plaintiff seeks a determination that her student loan debt was discharged on January 19, 2010, when this Court entered a discharge order in this bankruptcy case (the "Discharge Order"). Plaintiff has two basic types of student loan debt (collectively "Student Loans"): (1) general student loan debt, ultimately consolidated through defendant U.S. Department of Education ("DOE")(the "General Student Loan Debt"); and (2) student loans obtained through the Health Educational Assistance Loan Program of Defendant U.S. Department of Health and Human Services ("DHHS")("HEAL Loans"). For the reasons discussed *infra,* neither is dischargeable in this bankruptcy case.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

These facts are taken from the pleadings, exhibits, and other papers submitted by the parties, as well as the testimony adduced at trial. The facts are undisputed, except where otherwise indicated.

---

[1] The only named defendants to have participated in any way in this adversary proceeding are the U.S. Department of Education and the U.S. Department of Health and Human Services. The other defendants have no real interest to defend here. The Departments of Education and Health and Human Services, between themselves, now own all of the student loan debt sought to be discharged, leaving them as the only defendants with a real financial stake in the outcome of this adversary proceeding. *See In re Testaverde*, 317 B.R. 51, 54 (E.D.N.Y. 2004)(defining a "party in interest" as "one whose pecuniary interest is directly affected by the bankruptcy proceeding").

I.  Plaintiff's Educational and Occupational Background:

Plaintiff graduated from New York College of Osteopathic Medicine in 1992, having earned the degree of Doctor of Osteopathic Medicine (D.O.).[2] That same year, Plaintiff married her husband. Plaintiff separated from her husband in 2008, and is currently litigating against him over various matters in a pending state-court divorce proceeding (the "Divorce Litigation").

In 1993, Plaintiff was licensed as a physician in the State of New York, and has maintained her medical license since that time. Plaintiff was board certified in 1995, and she is a member in good standing of several professional associations. Plaintiff's primary practice area is family medicine.

From about 1993 to 2002, Plaintiff practiced as a family physician at Family Care, which at the time was owned by another physician. In 1997, Plaintiff became a partner in Family Care. Plaintiff's salary during this time ranged from $60,000-$120,000 per year. In 2002, Plaintiff left Family Care to start her own practice, ABC Family Care. ABC Family Care started off well, with Plaintiff paying herself around $100,000 per year. However, ABC Family Care ultimately failed. In 2005, mainly due to staggering business debt related to ABC Family Care, Plaintiff filed in this Court a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), captioned *In re Grubin*, case no. 05-8401. This case was dismissed in December, 2006.

In July of 2007, Plaintiff obtained employment as a physician with Lebanon Hospital in the Bronx ("Bronx Lebanon"), where she earned about $155,000 per year. Nevertheless, in September of 2009, Plaintiff's employment with Bronx Lebanon was terminated, largely due to hospital budget cuts.

---

[2] A D.O. receives all of the formal training of a Medical Doctor, and is able to practice medicine to the same extent as a Medical Doctor. However, in addition to the standard medical training, a D.O. is also trained to manipulate the muscular and skeletal systems in order to promote wellness and healing.

Plaintiff obtained her last job in June of 2010, working for another family care practitioner, at an annual salary of $125,000. Plaintiff's last day of work was approximately February 2, 2011, when she slipped on ice and sustained injuries to her neck and back, which disabled her.[3] Plaintiff underwent neck surgery in March, 2011, as well as back surgery in May of 2012. Plaintiff has not actively sought employment since becoming disabled, except to circulate her resume` in the event positions become open at a time when she is no longer disabled. Plaintiff actively desires to return to work as soon as she can. Plaintiff estimates her remaining work life, once her disability is past, to be between 20-25 years.

II. This Bankruptcy Case:

On October 9, 2008, while Plaintiff was still employed with Bronx Lebanon, she filed the instant bankruptcy case seeking relief under chapter 11 of the Bankruptcy Code. This case was converted to a chapter-7 liquidation on August 3, 2009, and the Discharge Order was issued on January 19, 2010. $875,430.30 in claims scheduled by the Debtor and filed by creditors were discharged.

III. The Student Loans:

Plaintiff took out two groups of student loans in order to finance her medical education.

*A. The HEAL Loans.*

The HEAL Loans consist of two promissory notes in the amount of $15,000 apiece, executed on August 27, 1990 and May 31, 1991, respectively, in favor of Defendant DHHS. Plaintiff has not made a payment on the HEAL Loans since 2005. On April 17, 2008, the United States commenced an action against Plaintiff in the United States District Court for the Eastern District of New York (the "District Court"), captioned *United States of America v. Grubin*, CV-

---

[3] Nothing in the record indicates the precise nature and extent of Plaintiff's disability. Moreover, this court was unable to ascertain it through observing Plaintiff at trial, where Plaintiff arrived, took the witness stand, and testified articulately, all under her own power.

08-277 (Spatt, J.), in order to recover amounts due under the HEAL Loans. The District Court granted default judgment in favor of the United States, and against Plaintiff, in the amount of $34,055.33, with interest at an annual rate of 2.05% (the "District Court Judgment"). Plaintiff has made no payments due under the District Court Judgment, nor was this judgment appealed.

   *B. The General Student Loan Debt.*

   The General Student Loan Debt originally consisted of 16 separate loans, with promissory notes executed by Plaintiff, in favor of Defendant New York State College of Osteopathic Medicine, at an original combined principal balance of about $76,000. Plaintiff incurred the General Student Loan Debt between 1988 and 1992. In or around the month of September, 2001, Plaintiff consolidated the General Student Loan Debt with Defendant Sallie Mae, at a time when the balance of the General Student Loan Debt was $54,000. It was around this time, according to Plaintiff's trial testimony, that she stopped making payments on the General Student Loan Debt. On February 28, 2008, the General Student Loan Debt was transferred to Defendant New York Higher Education Services Corporation ("NYHESC"), with a principal balance of $65,157.40.

   Shortly after the Discharge Order, and while Plaintiff was still employed at Bronx Lebanon, NYHESC began placing "harassing" phone calls to Plaintiff's employer, seeking repayment of the General Student Loan Debt. Plaintiff, feeling overwhelmed by NYHESC's aggressive collection efforts, the turmoil in her family life, and the stress associated with her bankruptcy filing, reached out to an entity called College Educational Services ("CES") for help in dealing with NYHESC.

   CES, on Plaintiff's behalf, entered into an agreement with Defendant DOE to consolidate and refinance the General Student Loan Debt under the William D. Ford Federal Direct Loan

Program (the "Federal Direct Consolidation Loan").[4] This was done by promissory note executed on March 16, 2011. Under the Federal Direct Consolidation Loan, DOE disbursed $92,409 in order to discharge Plaintiff's obligations to NYHESC, thereby assuming the General Student Loan Debt.

Under the terms of the Federal Direct Consolidation Loan promissory note, Plaintiff had the option of selecting one of a variety of repayment plans. Plaintiff chose the "income-contingent" repayment plan. Under the income-contingent repayment plan, the monthly payment amount is calculated based upon factors such as adjusted gross income, family size, and the total outstanding student loan debt. Also, under the income-contingent repayment plan, any unpaid portion of the student loan debt remaining after 25 years will be forgiven.

Plaintiff's monthly payments on the General Student Loan Debt, under the income-contingent repayment plan, have been $0.00 per month. This is because the non-taxable income that Plaintiff receives now apparently does not meet the definition of "adjusted gross income" for purposes of the income-contingent repayment plan, so that her payments are being calculated on an income baseline of 0.

IV. Plaintiff's Financial Picture.

A. Income.

Plaintiff currently receives income from 2 sources, neither of which is subject to federal income taxation. Plaintiff's total, non-taxable income per month, at present, is roughly $6,380. Plaintiff's primary source of income consists of payments under a disability insurance policy, which Plaintiff took out around the time she graduated from medical school. Currently, Plaintiff receives about $5,230 per month in non-taxable disability benefit payments, and she is not

---

[4] At trial, Plaintiff stated that she never authorized CES to enter into the Federal Direct Consolidation Loan on her behalf. Nevertheless, for the reasons discussed *infra*, Plaintiff is bound by the terms of the Federal Direct Consolidation Loan.

required to pay disability insurance premiums while receiving payments.[5] At trial, Plaintiff indicated that she stands to receive these payments at least until she reaches age 65, which will be in the year 2031.

Plaintiff also receives roughly $1,150 per month in child support payments from her former husband. The ultimate status and amount of these payments will depend on various factors, such as the Divorce Litigation and the looming adulthood of Plaintiff's daughters.

*B. Assets.*

Plaintiff's assets include:

(1). Plaintiff's residence, which is a single-family dwelling located on Long Island (the "Residence"), which Plaintiff owns along with her former husband.[6] Plaintiff occupies the Residence with her 2 daughters, one aged 15, and the other aged 17.

The Residence was last formally appraised in 2009 as being worth $475,000. The Residence is subject to a mortgage, on which is owed approximately $228,000. The Residence is also subject to a subordinate lien, in favor of Plaintiff's mother,[7] in the amount of $60,000.

(2). Plaintiff's two automobiles. One is a 2000 Dodge Neon, and the other is a 2000 Chevy Astro mini-van.

---

[5] Plaintiff's disability payments began in July, 2011, when her disability insurer determined that she was totally disabled. The payments were reduced to $3,230 per month in March of 2012, because Plaintiff's disability insurer had determined that Plaintiff was only partially disabled. Following Plaintiff's back surgery in May of 2012, the insurer determined that Plaintiff was again totally disabled, and the payments were thus increased back to $5,230 per month.

[6] Plaintiff's former husband currently holds one-half of the equity in the Residence. However, in the Divorce Litigation, Plaintiff is seeking a determination that all of the equity in the Residence belongs to her.

[7] During the course of this bankruptcy case, the trustee determined that there was roughly $50,000-$60,000 of equity in the Residence in excess of any encumbrances, or any exemption which Plaintiff might claim, and that this equity ought to be applied for the benefit of Plaintiff's creditors. Thus, the trustee thought to sell the Residence, pay the Plaintiff the value of her exemption, pay off the mortgage, and then distribute the rest to creditors. In order to prevent the sale of the Residence, Plaintiff's mother lent Plaintiff $60,000 with which to pay the trustee. In return, Plaintiff's mother received a lien on the Residence for $60,000.

(3). Plaintiff owns 2 Individual Retirement Accounts (the "IRA's"). Plaintiff listed the IRA's as being worth $5,000 in her bankruptcy schedules. Plaintiff also listed a few other small assets on her bankruptcy schedules.

*C. Expenses.*

Plaintiff currently pays $3,000 per month on the mortgage for the Residence, plus related property taxes and insurance. Aside from the mortgage, the $60,000 debt to Plaintiff's mother (on which Plaintiff has made only sporadic payments), and the Student Loans, Plaintiff has no other substantial, outstanding debt in the wake of the Discharge Order.

Plaintiff claimed about $2,000 per month in additional expenses on her bankruptcy schedules. At trial, Plaintiff indicated that these expenses have increased, primarily due to increasing real estate taxes and various payments related to certain physical and emotional problems on the part of Plaintiff's younger daughter, so that her expenses now total about $6,320 per month, leaving her with little to no surplus income. Some of these expenses are set forth in the complaint for this adversary proceeding. Plaintiff anticipates that she will incur additional expenses when her daughters begin attending college.

V. This Adversary Proceeding:

Plaintiff filed this adversary proceeding on September 19, 2011, which came to trial before this Court on July 30, 2012.

ISSUE

Whether Plaintiff has met her burden of proving the dischargeability of the Student Loans.

<u>DISCUSSION</u>

Plaintiff seeks discharge of the Student Loans, on the grounds that non-discharge of the Student Loans would subject her and her daughters to undue hardship. Nevertheless, as explained *infra*, different legal standards govern the dischargeability of the General Student Loan Debt and the HEAL Loans. Therefore, this opinion discusses each category of debt separately. Even so, before addressing the merits of Plaintiff's dischargeability claims, a related issue needs to be addressed—whether Plaintiff is even obligated under the Federal Direct Consolidation Loan with respect to the General Student Loan Debt.

<u>I. Plaintiff is obligated under the Federal Direct Consolidation Loan</u>.

At trial, Plaintiff alleged that she never authorized CES to enter into the Federal Direct Consolidation Loan on her behalf, and that her signature does not appear on the related promissory note. Nevertheless, this Court finds that Plaintiff is bound by the terms of the Federal Direct Consolidation Loan, because: CES, acting as Plaintiff's agent, entered into the Federal Direct Consolidation Loan on Plaintiff's behalf, and either (1) CES did so with actual authority, or (2) Plaintiff ratified CES' actions by her conduct.

The relationship of principal and agent arises when (1) the principal manifests consent to the agent that the agent shall act on the principal's behalf, and subject to the principal's control, and (2) the agent consents so to act. *See* Restatement (Second) of Agency § 1. CES was Plaintiff's agent for purposes of dealing with NYHESC, because (1) Plaintiff reached out to CES to do this on her behalf, and subject to her control, and (2) CES consented so to act. This is evidenced by Defendant's exhibit A, which consists of the terms of service and related documents governing the relationship between Plaintiff and CES.

It is a basic precept of the law of agency that the principal is bound by any agreement entered into by the agent, with a third party, so long as the agent was acting with actual authority. Even if the agent did not act with actual (or any other kind of) authority, the principal is still bound upon conduct constituting a ratification of the agreement. *See* Restatement (Third) of Agency §§ 4.02, 6.01.

*A. CES had actual authority to enter into the Federal Direct Consolidation Loan on Plaintiff's behalf.*

This Court finds that CES acted with actual authority to enter into the Federal Direct Consolidation Loan on Plaintiff's behalf. On the very first page of exhibit A, there is set forth a non-exclusive list of services that CES could or would perform for Plaintiff. Among these services is helping Plaintiff obtain "debt consolidations," which is precisely what the Federal Direct *Consolidation* Loan was. Plaintiff never once objected to CES entering into the Federal Direct Consolidation Loan. Furthermore, on March 8, 2011, Plaintiff executed a limited power of attorney in favor of CES, which expressly gave CES the authority, among other things, to "negotiate on all financial accounts to achieve a reasonable resolution" with any entity possessing an interest in her "financial issues." Therefore, in light of this, CES had actual authority to enter into the Federal Direct Consolidation Loan on Plaintiff's behalf.

*B. Plaintiff ratified the Federal Direct Consolidation Loan by her conduct.*

Alternatively, this Court finds that Plaintiff ratified the Federal Direct Consolidation Loan by her conduct, and is therefore bound by its terms. Ratification occurs where a person with knowledge of the material facts engages in "conduct that justifies a reasonable assumption that the person" consents to be bound by the terms of an agreement which was entered into, by a purported agent, before the time of ratification. *See* Restatement (Third) of Agency § 4.01(2)(b). Once a principal ratifies the act of an agent, the principal is bound as if s/he had authorized the

act in the first place. Restatement (Second) of Agency § 82; Restatement (Third) of Agency § 4.02(1).

Moreover, "[a]ccepting the benefits of an agent's… act, where the benefit could not have been attained without the… act, can manifest [ratification]." *Amusement Industry, Inc. v. Citigroup Global Markets Realty Corp. (In re First Republic Group Realty, LLC)*, 421 B.R. 659, 682 (Bankr. S.D.N.Y. 2009). Here, Plaintiff has ratified CES's act of entering into the Federal Direct Consolidation Loan, primarily by knowingly enjoying, without objection, the substantial financial and other benefits that have accrued to her as a result of the Federal Direct Consolidation Loan.

On March 16, 2012, the very day that the Federal Direct Consolidation Loan was executed, Plaintiff selected the income-contingent repayment plan, which has allowed Plaintiff to remain "current" on her obligations, even though she has not made a single payment. Furthermore, now that DOE has taken over the General Student Loan Debt, NYHESC is no longer making Plaintiff miserable through aggressive collection efforts. These are benefits which Plaintiff could not have enjoyed, except by entering into the Federal Direct Consolidation Loan. It would be inequitable for this Court, a court of equity, to permit Plaintiff to have enjoyed the benefits of the Federal Direct Consolidation Loan for the past several months, and yet disclaim any obligation under it now on the basis that CES lacked authority to enter it. *See id.*

## II. The General Student Loan Debt.

The General Student Loan Debt is non-dischargeable on two grounds: (1) It is a post-petition obligation, and therefore was not subject to the Discharge Order. (2) Repayment of the General Student Loan Debt would not impose an undue hardship on Plaintiff or her daughters.

*A. The General Student Loan Debt was not subject to the Discharge Order, because it is a post-petition obligation.*

Plaintiff initially incurred the General Student Loan Debt between 1988 and 1992. She filed the petition in the instant bankruptcy case on October 9, 2008, roughly 16 years later, which would seem to indicate that the General Student Loan Debt is pre-petition debt. Nevertheless, Plaintiff entered into the Federal Direct Consolidation Loan on March 16, 2011, roughly 2.5 years *after* she filed this bankruptcy case. It is settled that, where a debtor incurs student loan debt pre-petition, but then enters into a post-petition agreement to consolidate that debt, the consolidation agreement extinguishes the pre-petition debt and gives rise to new, post-petition debt. *See, e.g. Hiatt v. Indiana State Student Assistance Comm'n*, 36 F.3d 21, 23-24 (7th Cir. 1994) (holding that the consolidation of student loan debt extinguished the prior obligation and gave rise to a new obligation as of the time of consolidation); *Educational Credit Mgm't Corp. v. McBurney (In re McBurney)*, 357 B.R. 536, 538-39 (9th Cir. B.A.P. 2006) (adopting *Hiatt's* reasoning and holding that a post-petition student loan consolidation gives rise to a new, post-petition obligation); *Rudnicki v. Southern College of Optometry (In re Rudnicki)*, 228 B.R. 179, 180-81 (6th Cir. B.A.P. 1999) (agreeing with *Hiatt* that "a consolidated student loan is a new loan").

Section 727(b) of the Bankruptcy Code provides that a chapter-7 discharge discharges the debtor "from all debts that arose *before* the date of the order for relief [i.e. the filing of the petition]…". 11 U.S.C. § 727(b) (emphasis added). A necessary corollary of this rule is that a chapter-7 discharge does *not* operate against debts that arose *after* the petition date.[8] *See Matter*

---

[8] Section 727(b) provides for the discharge of certain kinds of obligations that, though they technically arose post-petition, are statutorily deemed to have arisen pre-petition. Student loan obligations are generally not among these kinds of obligations. *See* 11 U.S.C. § 727(b).

*of Rosteck*, 899 F.2d 694, 696 (7th Cir. 1990). Thus, since the General Student Loan Debt is deemed to be a post-petition obligation, it is not subject to the Discharge Order.

Plaintiff may not have understood that she was entering into a post-petition agreement which would not be included in her bankruptcy discharge, but, as discussed *infra*, she does have the benefit of mitigated repayment terms. Therefore, since the Federal Direct Consolidation Loan extinguished Plaintiff's pre-petition obligations and gave rise to brand new, post-petition obligations, the General Student Loan Debt was not subject to the Discharge Order, under 11 U.S.C. § 727(b).

*B. The General Student Loan Debt is non-dischargeable under 11 U.S.C. § 503(a)(8), because Plaintiff has not met her burden of showing that repayment of the General Student Loan Debt would impose an undue hardship.*

Even assuming *arguendo* that the General Student Loan Debt was still a pre-petition obligation in the wake of the Federal Direct Consolidation Loan, it is still non-dischargeable. Section 523(a)(8) of the Bankruptcy Code provides that student loan debt is not subject to discharge in bankruptcy, "unless excepting such debt from discharge… would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(A) and (B). Plaintiff here bears the burden of proving, by a preponderance of the evidence, that exempting the General Student Loan Debt from discharge would impose "undue hardship." *See In re L.K.*, 351 B.R. 45, 53 (Bankr. E.D.N.Y. 2006). That burden is a heavy one, because 11 U.S.C. § 523(a)(8) clearly demonstrates a Congressional intent to make the discharge of student loan debt more difficult than most other kinds of debt. *See id.* at 54.

The Second Circuit Court of Appeals has set forth a three-pronged test for determining whether non-discharge of student loan debt would impose "undue hardship." *Brunner v. New York State Higher Educ. Svc's Corp.*, 831 F.2d 395 (2d. Cir. 1987). This test has come to be

known as the *Brunner* test. Failure of any one element of the *Brunner* test is fatal to an "undue hardship" claim. *In re L.K.,* 351 B.R. at 53. The three elements of the *Brunner* test are:

(1). <u>The debtor cannot maintain, based on current income and expenses, a "minimal"</u> <u>standard of living for herself and her dependents if forced to repay the student loans</u>. This is the heart of the *Brunner* test. *See Brunner,* 831 F.2d at 396. In order to satisfy this element, Plaintiff must show that the financial strain of repaying the General Student Loan Debt would be more severe than "tight finances," but not necessarily such as would drive her below the poverty line. *See In re L.K.*, 351 B.R. at 53.

Plaintiff here has not met her burden of showing that she could not maintain a minimal standard of living for herself and her daughters if forced to repay the General Student Loan Debt. As discussed above, Plaintiff currently receives roughly $6,330 per month, or $75,840 per year, in <u>non-taxable</u> income, which enables her to afford: the mortgage, insurance, and taxes on the Residence; cable television and other utilities; expenses for her two vehicles; and extra-curricular activities for her daughters.[9]

Plaintiff's only financial obligations, in the wake of the Discharge Order, consist of the mortgage on the Residence, the General Student Loan Debt, the HEAL Loans (on which Plaintiff has made no payments since 2005, and which now bear a miniscule interest rate of 2.05% after the District Court Judgment), and the $60,000 debt owing to Plaintiff's mother (as to which there exists no formal arrangement for repayment).

Moreover, Plaintiff currently enjoys a $0.00-per-month repayment obligation under the Federal Direct Consolidation Loan, because, as discussed above, she selected the "income-

---

[9] It is true that, at trial, Plaintiff claimed that her expenses roughly equal her income, and this Court refers to Plaintiff's adversary complaint for the particulars of those expenses. This Court is struck by one expense item in particular--$600 per month for telephone, cable and internet. Plaintiff listed these expenses at $325 per month on her bankruptcy schedules. Thus, this Court has difficulty believing that these expenses, and several others, could not be lowered, substantially, while still enabling Plaintiff to enjoy the services in a meaningful way.

contingent" repayment plan. If Plaintiff remains "current" for 25 years from the date of the Federal Direct Consolidation Loan, then any remaining obligations will be forgiven, even if she continues to pay nothing for the remainder of that time due to the non-taxable nature of her income.

It is true that, if Plaintiff ever does return to work and resume earning a salary, then that income *will* constitute "income" under the income-contingent repayment plan, which will require the Debtor to begin making payments. Nevertheless, Plaintiff is no ordinary wage-earner; she is a licensed physician with a strong, if somewhat intermittent, salary history, generally ranging from $100,000-$150,000 per year. Plaintiff estimates that she has a remaining working life of 20-25 years, once her disability is removed. Nothing on the record in this case indicates that Plaintiff's earning potential will be significantly reduced in the foreseeable future.[10]

This Court believes that Plaintiff does not intend to renege totally on repayment of the General Student Loan Debt, as she acknowledged that she expected to be able to resume working within a year, after a full recovery from her disability. However, it appears that Plaintiff is concerned that the Student Loans as a whole will grow to a point where it would become infeasible to repay it within a reasonable time, in her lifetime. No one has a crystal ball. Plaintiff may win the lottery, or otherwise strike it rich, and thus become able to repay the Student Loans all at once—or, Plaintiff may become further incapacitated, and be unable to repay any of it.

In any case, the terms of the Federal Direct Consolidation Loan afford Plaintiff sublime flexibility. Plaintiff is allowed to change her repayment plan "at any time" if the terms of the income-contingent repayment plan become infeasible upon her return to work, or if the outcome

---

[10] At trial, Plaintiff did indicate that salaries in her area of practice, family medicine, are on the decline, and that this condition is likely to persist. However, salaries are inherently a function of infinite and ultimately unpredictable market conditions, as to which this Court is ill-equipped to speculate. In any case, Plaintiff herself was earning $125,000 per year as recently as January of 2011, which tends to indicate that there is still the potential for family practitioners such as Plaintiff to earn a very decent living.

of the Divorce Litigation (or the coming adulthood of her daughters) diminishes or eliminates the child support income, or if her daughters' college expenses in coming years prove too burdensome.[11] In addition to the variety of repayment plans, the terms of the Federal Direct Loan Consolidation agreement provide for deferment or forbearance of payment under various circumstances, including when repayment would impose certain kinds of economic hardship.[12]

These factors, taken together, indicate that Plaintiff could maintain a comfortable standard of living for herself and her daughters, even if the General Student Loan Debt is not discharged. Plaintiff, who again bears a heavy burden here, has not adduced countervailing factors showing that repaying this debt would be such an onerous burden that Plaintiff could not maintain a minimal standard of living. Therefore, in light of the foregoing, Plaintiff has not met her burden with respect to the first prong of the *Brunner* test. This alone is fatal to her "undue hardship" claim. *In re L.K.*, 351 B.R. at 53.

(2). Additional, exceptional circumstances indicate that this state of affairs will persist for a significant portion of the repayment period of the student loans. This is the second element of the *Brunner* test—Plaintiff here must show circumstances indicating that, for a significant portion of the repayment period of the General Student Loan Debt, she will not be able to maintain a minimal standard of living for herself and her dependents. *See Brunner*, 831 F.2d at 396.

---

[11] Of course, it does not seem unreasonable to expect that the daughters will do as their mother did—pay their own way through college (and beyond) by, *inter alia*, taking out loans. Furthermore, assuming that the ex-husband wants to be involved in his daughter's lives, it does not seem unreasonable to expect that he might help with the college expenses. Relatedly, since the daughters are nearing adulthood, it seems reasonable to expect that they will begin to contribute more to their own general expenses as they get older, relieving some of the burden on Plaintiff.

[12] *See* Defendant's exhibit 5, pages 6-8 of the Federal Direct Loan Consolidation Application and Promissory note, which was entered into on Plaintiff's behalf.

Even if this Court were to find that Plaintiff could not maintain a minimal standard of living if forced to repay the General Student Loan Debt, it could not find that this state of affairs would persist for a substantial portion of the repayment period. This is because Plaintiff is a licensed physician, with a strong earning history and a long working life ahead of her, who is not *permanently* disabled, and who stands to make an above-average living once she returns to work.

(3). <u>The Debtor has made good faith efforts to repay the loans</u>. This is the third element of the *Brunner* test. *Id.* Given this Court's disposition of the first two elements of the *Brunner* test, it is unnecessary to analyze this one, because the elements of the *Brunner* test proceed sequentially—the Court need not analyze elements (2) and (3), for example, if element (1) fails. *See In re L.K.*, 351 B.R. at 53. Even so, Plaintiff's testimony at trial indicates that she only made timely payment towards the General Student Loan Debt until August of 2001. Still, the "good-faith effort" prong of the *Brunner* test does not require a history of *repayment,* so much as a history of genuine *effort* to repay, considering all the circumstances. *See Id.* at 55.

The record before this Court does not seem to signal any genuine effort by Plaintiff to repay the General Student Loan Debt since 2001, except to shift it from one consolidator to another as interest accrued and arrears increased. Good faith effort must be evaluated in light of the overall context of the debtor's behavior. *See In re Wallace*, 259 B.R. 170, 184 (C.D. Cal. 2000).  Plaintiff apparently undertook staggering business debt in connection with ABC Family Care, knowing that the General Student Loan Debt was outstanding. Her payments stopped cold in 2001, and never really resumed, even though she was earning six-figure salaries during much of that time (or non-taxable income tantamount to a six-figure salary), and even though she was discharged of over $875,000 of debt by the Discharge Order. All of this, taken together, militates

strongly against a finding of good faith effort on her part. Plaintiff, who bears the burden of proof, has not adduced countervailing evidence indicating that she *has* made a good faith effort.

Therefore, in light of the foregoing, even if the Federal Direct Consolidation Loan were a pre-petition obligation, Plaintiff has not met her burden of showing that the General Student Loan Debt would be dischargeable under 11 U.S.C. § 523(a)(8).

III. The HEAL Loans.

Dischargeability of the HEAL Loans is not governed by 11 U.S.C. § 523(a)(8); rather, dischargeability of HEAL Loans is governed by 42 U.S.C. § 292f(g). *See Woody v. U.S. Dep't of Justice (In re Woody),* 494 F.3d 939, 947 (10th Cir. 2007) (analyzing dischargeability of HEAL loans under 42 U.S.C. § 292f(g)); *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1148-49 (6th Cir. 1996) (same); *U.S. Dep't of Health and Human Svc's v. Smitley*, 347 F.3d 109, 115-16 (4th Cir. 2003) (same).

Section 292f(g) provides:

Notwithstanding any other provision of Federal or State law, a debt that is a [HEAL Loan] may be released by a discharge in bankruptcy under any chapter of Title 11, only if such discharge is granted—

(1) after the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended;

(2) *upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable*; and

(3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt.

42 U.S.C. § 292f(g) (emphasis added). The parties have adduced virtually no evidence as to whether § 292f(g)(1) and (3) are satisfied, except to point out at trial that the first payment on the HEAL Loans came due more than seven years ago. Nevertheless, assuming for the sake of

this decision that § 292f(g)(1) and (3) are fully satisfied, the HEAL Loans are still non-dischargeable, because Plaintiff has not met her burden to show that nondischarge of her HEAL Loans would be "unconscionable."

In using the term "unconscionable," Congress intended to impose a standard for discharge of HEAL Loans which is significantly more stringent and difficult to meet than even the "undue hardship" standard under 11 U.S.C. § 523(a)(8). *In re Rice*, 78 F.3d at 1148-49. Congress' objective here was "to severely restrict the circumstances under which a HEAL loan could be discharged in bankruptcy." *Id.* at 1149. The courts have defined "unconscionable" as "excessive, exorbitant, lying outside the limits of what is reasonable or acceptable, shockingly unfair, harsh, or unjust, or outrageous." *In re Woody*, 494 F.3d at 948 (quoting *Smitley*, 347 F.3d at 116) (internal quotes omitted).

It is worth noting that the structure of the "unconscionability" test is different from the *Brunner* test for "undue hardship." While *Brunner* employs a rigid, three-step analysis, "unconscionability" is ultimately determined by an evaluation of the "totality of the circumstances," considering a non-exhaustive list of factors.[13] Ultimately, though, the tests both evaluate all factors relative to a debtor's income, domestic situation, expenses, health, education, earning potential, overall debt burden, and the terms of the debt sought to be discharged, and

---

[13] Those factors include: (1) the debtor's income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree; (2) the debtor's claimed expenses and standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents; (3) whether the debtor's current situation is likely to continue or improve, including whether the debtor has attempted to maximize his income by seeking or obtaining stable employment commensurate with his educational background and abilities, and whether the debtor is capable of supplementing his income through secondary part-time or seasonal employment, even if already employed full time; (4) whether the debtor's dependents are, or could be, contributing financially to their own support; (5) the amount of the debt and the rate at which interest accrues; the debtor's "good faith," i.e. his role in allowing the debt to accrue including previous efforts to repay the HEAL obligation, including the debtor's financial situation over the course of time when payments were due; the debtor's voluntary undertaking of additional financial burdens despite his knowledge of his outstanding HEAL debt; and the percentage of the debtor's total indebtedness represented by student loans. *In re Woody*, 494 F.3d at 948-49. In substance, these factors are very similar to the kinds of factors which are relevant to the *Brunner* test.

they both ask whether she can reasonably sustain herself and her dependents, to one extent or another, for a significant portion of the repayment period, if forced to repay the loans. Both tests also consider any good-faith efforts to repay the loans. *Compare Brunner*, 831 F.2d at 396, *with In re Woody*, 494 F.3d at 948-949.

It is worth noting here that this Court has already found that Plaintiff has not met the "undue hardship" standard with respect to the discharge of her General Student Loan Debt. For the same reasons, this Court finds that Plaintiff has failed to meet her burden to show that non-discharge of her HEAL Loans would be "unconscionable." The factors relative to Plaintiff's income, earning potential, etc. indicate that she could maintain a relatively comfortable lifestyle for herself and her daughters, even if the Student Loans are not discharged. Plaintiff has adduced no countervailing evidence indicating that, despite these factors, non-discharge of the HEAL Loans would be "excessive, exorbitant, lying outside the limits of what is reasonable or acceptable, shockingly unfair, harsh, or unjust, or outrageous." Moreover, it is worth repeating that Plaintiff has not made one payment on the HEAL Loans since 2005, roughly seven years hence, despite the entry of the District Court Judgment in 2008, despite the infinitesimal interest rate of 2.05%, despite her relatively high income, and despite jettisoning over $875,000 in unsecured debt by virtue of the Discharge Order.

Therefore, in light of the foregoing, this Court finds that Plaintiff has not met her burden of showing that the HEAL Loans are dischargeable in bankruptcy.

<u>CONCLUSION AND ORDER</u>

Though a litigant who proceeds *pro se* is entitled to some leniency, due to the fact that she did not have the benefit of counsel, it goes without saying that she is not ultimately relieved of the burden to prove her case. Pursuant to the law of this case, Plaintiff here has simply not

proven her case. Therefore, based on the foregoing, the Court cannot discharge the Student

Loans. Thus, the relief requested in the adversary complaint in this proceeding must be **denied.**

     *So Ordered.*



**Dated: Central Islip, New York**
        **August 7, 2012**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**